***********
Upon review of the competent evidence of record with reference to the errors assigned and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission modifies and affirms the Opinion and Award of the deputy commissioner as follows:
 *********** RULING ON MOTION TO DISMISS
Decedent was diagnosed with stomach cancer on 11 December 2000 and he died on 14 June 2001 as a result of the cancer. On 29 May 2001, Dr. Arthur Frank sent a letter to decedent's attorney wherein he opined that decedent's stomach cancer was caused by his exposure to asbestos. On 27 September 2001, a Form 18B was filed on behalf of the estate of Leroy Colbert and his dependents claiming benefits for the disease of stomach cancer allegedly caused by his occupational exposure to asbestos. Defendants filed a Motion to Dismiss plaintiff's claim on 4 June 2002, contending that plaintiff's claim is barred by the terms of prior Compromise Settlement Agreements. Deputy Commissioner Garner denied defendants' motion at a hearing on 7 June 2002 after considering extensive arguments from all parties. Defendants' exception to the Deputy Commissioner's ruling was duly noted for the record and this issue is properly before the Full Commission.
Defendants also moved to set aside the Compromise Settlement Agreement due to fraud and misrepresentation. Deputy Commissioner Garner reserved ruling on this motion and agreed to allow the parties an opportunity to pursue this issue at a subsequent hearing. This issue is currently not being considered by the Full Commission.
Decedent filed a Form 18B claim for asbestosis on 28 October 1992. The asbestosis claim settled on or about 24 January 2001. There were two defendant-employers in the asbestosis claim, Owens Illinois and Nekoosa Packaging Corporation. Both defendants settled the asbestosis claim at the same time.
Defendants drafted the Compromise Settlement Agreements and mailed them to decedent's attorney. Decedent signed the Compromise Settlement Agreements and mailed them back to defendants' attorney prior to 29 May 2001. Defendants sent the Compromise Settlement Agreements to the Industrial Commission for approval on 31 May 2001. The Compromise Settlement Agreements are dated 24 January 2001 and 5 February 2001, but there is no date indicating when decedent or defendants signed them. Decedent's claim for benefits due to stomach cancer was filed after 29 May 2001, when Dr. Frank opined that the cancer was related to asbestos exposure.
When defendants prepared the initial Compromise Settlement Agreements and submitted them to decedent's counsel, there was concern about the language regarding asbestos-related cancers. The original draft prepared by defendant-employer Nekoosa contained the following provision:
 Employee-plaintiff specifically reserves the right to bring an action under the North Carolina Workers' Compensation Act for further benefits, including, but not limited to, death benefits, should he subsequently develop or be diagnosed with cancer as a specific consequence of his exposure to asbestos.
(Emphasis added). Decedent's counsel asked that the language in this provision be changed. On 19 March 2001, defense counsel responded with the final agreement, which changed the language to reflect that decedent was reserving the right to file a claim "should employee-plaintiff develop or be diagnosed with an asbestos-related cancer."
In addition, the language in the Compromise Settlement Agreement with defendant-employer Nekoosa Packaging stated:
 Notwithstanding any other provision of this Settlement Agreement, Employee-Plaintiff, for himself and his heirs, next of kin, dependents, and personal representatives, reserves any right he or they might hereafter acquire to file a claim for workers' compensation benefits, including death benefits if applicable, should Employee-Plaintiff develop or be diagnosed with an asbestos-related cancer.
(Emphasis added). Defendants contend that the language "should employee-plaintiff develop or be diagnosed with an asbestos related cancer" means only future cancers.
Both parties were on notice that the cancer language was important and that decedent was reserving his right to file a claim for asbestos-related cancer even if the asbestos-related cancer did not develop "subsequent" to the Compromise Settlement Agreement. Defendants' argument that the language at issue refers only to future cancers is unpersuasive.
Decedent also reserved his right to file a claim for asbestos-related cancer with defendant-employer, Owens Illinois. In their initial draft of the Compromise Settlement Agreement, defendant Owens-Illinois included the following:
 Provided, however, the employee shall have the right to bring a claim against the defendant, Owens-Illinois if the employee should in the future contract cancer proximately as a result of his exposure with the employer.
(Emphasis added). Decedent's counsel suggested the same changes to the Compromise Settlement Agreement with Owens-Illinois that it had suggested to Nekoosa. Consequently, the final draft of the Compromise Settlement Agreement sent to decedent on 9 March 2001 included the suggested changes. In the revised agreement, the same provision as above reads as follows:
 Provided, however, the employee shall have the right to bring a claim against the defendant, Owens-Illinois if the employee should contract cancer proximately as a result of his exposure with the employer.
There is only one change in this language. The words "in the future" are excluded from the final draft. Therefore, it is clear that the parties intended to eliminate "future" and allow any
cancer to be the subject of a claim. In both Compromise Settlement Agreements, decedent specifically reserved his right to file for asbestos-related cancer.
We note that there is no evidence indicating when decedent or his attorney received the letter from Dr. Frank, but based on the greater weight of the evidence, the Full Commission finds that the letter was received after defendants forwarded the executed Compromise Settlement Agreements to the Industrial Commission for approval.
For these reasons, the Full Commission affirms the Deputy Commissioner's denial of defendants' Motion to Dismiss.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into at the hearing before the Deputy Commissioner as follows:
 STIPULATIONS
1. The decedent was employed by defendant-employers from 1963 until 1988. The decedent worked for Owens Illinois from 1963 until 1987. In 1987 the plant was sold to Nekoosa Packaging Corporation. The decedent worked for Nekoosa Packaging Corporation for approximately nine months and thereafter retired from this employment.
2. Owens-Illinois was self insured during the time of decedent's employment. Nekoosa Packaging was insured by Wausau Insurance during the entirety of decedent's employment.
3. The parties are subject to the North Carolina Workers' Compensation Act, the defendant-employers employing the requisite number of employees to be bound under the provisions of said Act.
 ***********
Based on the competent and credible evidence of record, the Full Commission finds as follows:
 FINDINGS OF FACTS
1. Decedent, Larry Colbert, Jr., worked for defendant-employers from 1963 until 1988 at the plant in Spencer, North Carolina. The facility is a box plant that manufactures cardboard boxes. The decedent had various jobs at the facility, but primarily ran machines that put glue on boxes. During the entirety of decedent's employment at the facility, he worked around asbestos products.
2. In September of 1994, the decedent was diagnosed with asbestosis by Dr. Dominic Gaziano. He then filed a workers' compensation claim for asbestosis. In 2001, that claim was settled with these same defendants.
3. On 11 December 2000, the decedent was diagnosed with stomach cancer. On June 14, 2001, the decedent died due to his stomach cancer, which had spread to his bones.
4. The decedent was exposed to asbestos on a daily basis throughout his employment with Owens Illinois and Nekoosa Packaging. His last exposure to asbestos would have been in 1988 while working for Nekoosa Packaging.
5. Asbestos was present in various forms in decedent's work area, including in tiles, mastics and, most notably, pipe insulation. The plant manager, Thomas Cadden, and several of decedent's co-workers testified that there were numerous insulated steam pipes located all over the plant, including overhead in the areas where decedent worked. The machine upon which decedent worked had insulated steam lines running directly to it.
6. The insulation covering the steam pipes contained asbestos. Records from a 1990 survey noted that the steam lines in the facility were covered with asbestos insulation. Abatement records also established that the steam lines throughout the manufacturing area where the decedent worked were covered with asbestos insulation.
7. The insulation on the steam lines was often damaged and deteriorated. The 1990 survey noted that insulation on the steam pipes was in "friable" condition, meaning that it was damaged. Asbestos dust from the damaged steam pipes was continuously released into the air where decedent worked. Also, workers, including the decedent, used compressed air to clean their work areas and used compressed air to blow off the insulated steam lines in their area, which would further damage the insulation and cause more asbestos dust to be released into the air that they breathed.
8. In 1994, Dr. Dominic Gaziano diagnosed the decedent with asbestosis. In December of 2000, Dr. James Johnson found increased fibrotic markings throughout both lung areas. In 2001, Dr. Fred Dula found interstitial abnormalities in the lungs consistent with asbestosis. This was confirmed with a CT scan. Upon reviewing these records, Dr. Arthur Frank also concluded that the decedent suffered from asbestosis.
9. Dr. Pohl noted that decedent's contraction of asbestosis establishes that he must have had significant exposure to asbestos. Dr. Pohl was of the opinion that asbestos-related cancer takes less asbestos exposure to develop than asbestosis. Therefore, the fact that decedent had asbestosis establishes that he also had significant enough exposure to cause asbestos-related cancer.
10. Dr. Arthur Frank was of the opinion that decedent's stomach cancer was caused by his exposure to asbestos. Dr. Frank is board certified in internal medicine and in the field of occupational medicine. He spent two years with the United States Public Health Service working with the National Cancer Institute, looking at the health effects of asbestos. At the time of the hearing before the deputy commissioner, he was a professor at Drexel University and director of the Center for Environmental and Occupational Health at Drexel University. Dr. Frank previously served as a professor of cell biology at the University of Texas. He has been published and peer reviewed on many articles, about half of which concern asbestos. He worked with Irving Selikoff, a well-known authority on asbestos in the United States.
11. Dr. Frank testified that based upon all the medical records and other evidence he reviewed, his knowledge and his experience, the decedent had asbestosis and stomach cancer which were causally related to decedent's exposure to asbestos while working for defendants. Dr. Frank also testified that there is a great body of literature discussing the link between asbestos exposure and stomach cancer. He testified that NIOSH, OSHA, the Department of Labor, the EPA and a number of other governmental agencies recognize the link between asbestos exposure and stomach cancer.
12. Dr. Douglas Pohl also testified as a medical expert in this case. Dr. Pohl is a pathologist who has experience in asbestos-related matters. He is board certified in anatomic pathology, clinical pathology and cytopathology. He routinely deals with patients diagnosed with asbestosis. Dr. Pohl agreed with Dr. Frank that there are numerous studies suggesting a link between stomach cancer and asbestos exposure. In his opinion, there was no doubt that asbestos can cause stomach cancer. Dr. Pohl testified and the Full Commission finds that there are various types of stomach cancer but the type from which decedent suffered is consistent with an asbestos-related cancer. He testified and the Full Commission finds that the decedent's exposure to asbestos while working for defendants caused or significantly contributed to the development of his stomach cancer.
13. Decedent died from stomach cancer, which was caused by his exposure to asbestos while employed by defendant Owen Illinois and Nekoosa Packaging. Decedent was last injuriously exposed to the hazards of asbestos while working for Nekoosa Packaging Corporation. Based on the greater weight of the evidence, the Full Commission finds that decedent's exposure to asbestos dust on an almost daily basis while working for defendant-employer increased his risk of developing stomach cancer over that of the general public not so employed. Dr. Pohl and Dr. Frank are of the opinion that there is an increased risk in asbestos workers over the general population of developing stomach cancer. Numerous studies from governmental and other credible agencies have established an increased risk for stomach cancer for workers who are exposed to asbestos over that of the general public. The federal government and medical authorities recognize the link.
14. Defendant offered the expert testimony of Dr. John Craighead who gave the opinion that asbestos did not cause decedent's stomach cancer. He based his opinion upon his belief that asbestos cannot cause stomach cancer. Dr. Craighead testified that there were "rather minimal amounts" of "literature out there" to support a link between asbestos and stomach cancer. Dr. Craighead's opinions differ from those of a large number of authorities on the relationship between stomach cancer and asbestos exposure. Based on the greater weight of the evidence, the Full Commission finds the opinions of Dr. Frank and Dr. Pohl more persuasive than the contrary opinions of Dr. Craighead.
15. The decedent's wife, Dorothy Colbert, is the statutory dependent of Leroy Colbert.
16. Decedent's widow, Dorothy Colbert was not unable to support herself due to physical or mental disability at the time of decedent's death. Mrs. Colbert testified she was unable to work and her physician gave the opinion that Mrs. Colbert is permanently and totally disabled. However, Mrs. Colbert worked part-time until she had to stop to primarily care for her husband several months before his death. She provided around-the-clock attendant care for her husband; she returned to part-time employment after his death and took over some responsibility for decedent's business after his death. Mrs. Colbert is making a claim for the attendant care services she provided to her husband, which also supports a finding that she was not disabled as defined by N.C. Gen. Stat. § 97-38 at the time of her husband's death.
17. Dorothy Colbert is entitled to 400 weeks of compensation at the rate of $350.56 per week as the sole dependent of decedent.
18. Decedent was totally unable to work as a result of his stomach cancer from December 11, 2000 to the date of his death on June 14, 2001. He initially was able to go to his worksite during short periods when he felt strong enough after chemotherapy treatment, but his efforts were not indicative of any capacity to earn wages.
19. At the time decedent was diagnosed with stomach cancer in December 2000 and subsequently advised by competent medical authority on 29 May 2001 that his stomach cancer was asbestos-related, he had retired from employment with defendant and was self-employed in his own office cleaning business.
20. Decedent was the owner and president of Colbert's, Inc. David R. McCoy was the accountant and CPA who handled the tax filings for decedent and Colbert's, Inc. Mr. McCoy testified that Colbert's, Inc. had a gross revenue of $225,121 in 1999; $248,036 in 2000; and $248,664 in 2001. Based on decedent's personal income tax returns, decedent received $14,125 in income from the company in 1999; $0 in 2000 and $0 in 2001. Further, the returns show that Colbert's, Inc. had a positive income of $8,227 in 2001; $8,418 in 2000; and $21,285 in 1999. However, Mr. McCoy further testified that decedent's company was an "S Corporation." The owner is the sole stockholder and all income of the corporation is deemed income of the owner as the sole stockholder. The Full Commission is unable to determine a fair way to determine decedent's earnings from his business at the time of diagnosis or disability.
21. It would be unfair to utilize the net earnings of decedent's business as proof of his average weekly wage. It would also be unfair to utilize decedent's gross earnings from his business as proof of his earnings as all of the revenue generated by the company would not be profit to decedent, reflect the value of the company, or the value of decedent's services to the company.
22. The fairest way to determine decedent's average weekly wage is to utilize the income decedent earned during the eight months that he was employed by defendant-employer Nekoosa, which was $18,221.38, resulting in an average weekly wage of $350.56.
23. Dorothy Colbert provided attendant care services to her husband. These attendant care services were reasonably required to provide relief and to assist Leroy Colbert with activities of daily living, transportation to and from the doctor and with medical maintenance. The testimony of Dorothy Colbert and Lydia Young on the amount of care decedent required and they provided is accepted as competent and credible evidence of the level of attendant care required by decedent. The Full Commission therefore finds that decedent needed and Dorothy Colbert and family members provided forty-six (46) hours per week of attendant care from 11 December 2000 to 28 February 2001; ten (10) hours per day seven (7) days per week from 1 March 2001 to 1 May 2001; and twenty-four (24) hours per day of attendant care from 2 May 2001 through 21 May 2001 and from 1 June 2001 through 14 June 2001. Defendants were obligated to provide attendant care services to decedent.
24. Mrs. Colbert had to quit her part-time job in March 2001 as the needs of her husband progressed in order to provide more hours of care for her husband.
25. The attendant care services provided by Mrs. Colbert and family members were valuable. Although no testimony was offered on the economic value of these services, the Commission finds that Mrs. Colbert's services should be compensated.
 ***********
Based on the foregoing stipulations and findings of facts, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Decedent was employed by defendant-employer Owens-Illinois from 1963 until 1987 and Nekoosa Packaging Corporation from 1987 to 1988. He was last injuriously exposed to asbestos in 1988 while employed by defendant-employer Nekoosa. N.C. Gen. Stat. §97-57.
2. Since Wausau Insurance Company was the carrier on the risk for Nekoosa Packaging Company at the time of decedent's last injurious exposure, it is liable for payment of compensation due decedent's estate and plaintiff pursuant to the Act. N.C. Gen. Stat. § 97-57.
3. Decedent contracted cancer as a result of his employment with defendant-employers. Cancer is not a specifically enumerated occupational disease under N.C. Gen. Stat. § 97-53. As a result, it falls under the catchall provision of N.C. Gen. Stat. § 97-53
(13). That provision defines occupational diseases as "any disease which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation, or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment." For a disease to be an occupational disease, it must be (1) characteristic of persons engaged in a particular trade or occupation in which the claimant is engaged; (2) not an ordinary disease of life to which the general public is equally exposed with those engaged in that particular trade or occupation; and (3) there must be a causal connection between the disease and the claimant's employment. Hansel v. ShermanTextiles, 304 N.C. 44, 52, 283 S.E.2d 101, 105-106 (1981). Looking at each of the three portions of the test, it is clear that decedent's stomach cancer is a compensable occupational disease. Based on the greater weight of the evidence, decedent's asbestos exposure caused or significantly contributed to the development of his stomach cancer and placed him at an increased risk of contracting asbestos-related stomach cancer. This stomach cancer resulted in his death. N.C. Gen. Stat. § 97-53(13).
4. Decedent's asbestos-related stomach cancer caused permanent injury to his stomach, an important internal organ of the body. Proper and equitable compensation for the damage to his stomach, which caused his death, is $20,000.00, the maximum allowed by the Act. N.C. Gen. Stat. § 97-31(24).
5. All medical bills and expense associated with decedent's contraction of stomach cancer, a compensable occupational disease, to the extent that such treatment was designed to effect a cure, give relief or lessen his period of disability are to be paid by defendant-carrier, Wausau Insurance. N.C. Gen. Stat. §§ 97-25; 97-25.1.
6. Dorothy Colbert is the sole dependent of the deceased, and therefore, she is the only person entitled to decedent's death benefits. She is therefore entitled to 400 weeks of compensation at $350.56 per week. N.C. Gen. Stat. §§ 97-38; 97-39.
7. The estate of Leroy Colbert is entitled to $3,500 for funeral expenses. N.C. Gen. Stat. § 97-40.
8. Dorothy Colbert and her family provided attendant care for decedent for the last six months of his life. The attendant care services were reasonably required to provide relief and lessen decedent's disability. Dorothy Colbert is entitled to payment for the attendant care services she provided to decedent as follows: forty-six (46) hours per week from 11 December 2000 to 28 February 2001; ten (10) hours per day seven (7) days per week from 1 March 2001 to 1 May 2001; and twenty-four (24) hours per day from 2 May 2001 through 21 May 2001 and from 1 June 2001 through 14 June 2001. The record should be re-opened to allow the parties to present sufficient evidence of a reasonable hourly rate of payment for such services to Dorothy Colbert. N.C. Gen. Stat. § 97-25.
9. Dorothy Colbert is not mentally or physically disabled within the meaning of N.C. Gen. Stat. § 97-38.
10. Defendants had reasonable grounds to defend this claim. N.C. Gen. Stat. § 97-88.1.
11. Defendant Nekoosa Packaging Company shall reimburse the estate of Leroy Colbert and any insurance companies, or other payors, as well as medical providers for all medical expenses incurred as a result of Leroy Colbert's compensable stomach cancer.
12. It is fairer to both parties to compute decedent's average weekly wage based on his earnings during his last eight months of employment at Nekoosa Packaging Corporation. N.C. Gen. Stat. §97-2(5).
 ***********
Based upon the foregoing findings of facts and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants Nekoosa Packaging Corporation and Wausau Insurance shall pay the estate of Leroy Colbert and any insurance companies, or other payors, as well as medical providers for all medical expenses incurred as a result of the decedent's compensable occupational disease.
2. Dorothy Colbert is the sole dependent of Leroy Colbert and is entitled to benefits at the compensation rate of $350.56 per week for 400 from the date of decedent's death.
3. Defendants Nekoosa Packaging Corporation and Wausau Insurance shall pay to the estate of Leroy Colbert the sum of $3,500 for burial expenses.
4. Defendants Nekoosa Packaging Corporation and Wausau Insurance shall pay to the estate of Leroy Colbert the sum of $20,000.00 for permanent injury to his stomach.
5. Defendants Nekoosa Packaging Corporation and Wausau Insurance shall pay Dorothy Colbert for the attendant care services she provided to decedent from 11 December 2000 to the date of his death. The amount owed to Dorothy Colbert shall be determined upon receipt of additional evidence.
6. A reasonable attorney fee in the amount of twenty-five percent (25%) of the compensation approved and awarded to decedent's estate and plaintiff is approved and allowed for plaintiff's counsel. The attorney fee shall be deducted from the compensation due decedent's estate and plaintiff and shall be paid directly to plaintiff's attorney.
7. Defendants Nekoosa Packaging Corporation and Wausau Insurance shall pay the costs due this Commission.
 ORDER
Dorothy Colbert is entitled to payment for the attendant care services she provided to decedent. There is insufficient evidence in the record to determine a reasonable rate of compensation for Mrs. Colbert. The record is therefore re-opened for receipt of additional evidence on a reasonable hourly rate for the attendant care services provided by Mrs. Colbert. The parties are allowed 30 days to present such evidence by stipulation or deposition testimony.
This the ___ day of July 2004.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER